**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| ELLIOTT BROIDY,<br><br>      Plaintiff,<br><br>  v.<br><br>AMERICAN EXPRESS COMPANY; and<br>AMERICAN EXPRESS NATIONAL BANK,<br><br>      Defendants. | Case No:  9:25-cv-80930 |

## AMERICAN EXPRESS COMPANY AND AMERICAN EXPRESS NATIONAL BANK'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Defendants American Express Company and American Express National Bank (together, "American Express" or "Amex"), hereby move this Court for an order dismissing this case and compelling Plaintiff Elliott Broidy ("Plaintiff" or "Broidy") to arbitrate his claim pursuant to the applicable Cardmember Agreements relevant to Plaintiff's claim and section 4 of the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (the "FAA"), or alternatively, to stay the matter during the pendency of such arbitration. Should the Court determine that Plaintiff's claim is not subject to arbitration, American Express moves to dismiss Plaintiff's Complaint (ECF No. 1) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In support, American Express states as follows:

### I.       INTRODUCTION

Plaintiff's single-count Complaint asserts a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA" or the "Act"), arising from American Express's purported failure to disclose a specific reason for its 2025 denial of Broidy Capital Holdings, LLC's application ("Broidy Capital" or "Company") to add Plaintiff as an additional cardholder to Broidy

Capital's business credit card account. Plaintiff is the Chief Executive Officer ("CEO") and Chairman of Broidy Capital. (Compl. ¶ 12.) This application was submitted at Plaintiff's direction by one of Plaintiff's employees, Broidy Capital's operations manager, Andrew Kang ("Kang" or "Basic Cardmember"). (*Id.* ¶¶ 16, 41–60; Denial Letter, ECF No. 1-1.)

As an initial matter, the Court must dismiss this matter because American Express has exercised its contractual right to compel arbitration under the Cardmember Agreement that governs the Broidy Capital account identified in the Complaint (*see* Decl. of Raquel Hernandez, Ex. 1, "2024 Cardmember Agreement").[1] The Company (including its principal, the Plaintiff), the Basic Cardmember, and Additional Cardholders are bound by that Agreement, including its Claims Resolution section, which requires disputes related to the Agreement to be arbitrated. To the extent that Plaintiff's claim is based on other American Express Cards he previously held, those are subject to materially identical cardmember agreements that also include mandatory arbitration provisions.

Even if the Court were to decline to enforce the arbitration provisions, the Complaint should still be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *First*, Plaintiff lacks Article III and statutory standing under ECOA, which provides only the applicant and not prospective secondary cardholders with a right of action. *Second*, American Express satisfied ECOA's notice requirement because it clearly explained that Plaintiff's "history with American Express" formed the basis of its decision (Compl. ¶ 34 (quotation marks omitted); *see also id.* ¶¶ 22, 26)—and Plaintiff knows that his "history" includes pleading guilty to a felony in 2020 (a fact about which this Court is entitled to take judicial notice).

---

[1] This motion is accompanied by the Declaration of Raquel Hernandez ("Decl."), attaching copies of relevant documents that the Court may rely upon in deciding this motion. All references herein to exhibits ("Decl. Ex. __") are to exhibits to the Declaration.

American Express respectfully requests that the Court enter an order: (1) directing Plaintiff to arbitrate all disputes related to his Accounts and dismissing this action or, in the alternative, (2) dismissing this action with prejudice for lack of standing and/or failure to state a claim.

## II.    FACTUAL BACKGROUND

In December 2024, Broidy Capital, with Kang as the Basic Cardmember, opened a Corporate Card account subject to the 2024 Cardmember Agreement. (Decl. ¶ 5; *id.* Ex. 1.) In February 2025, after Broidy's prior American Express cards had been canceled, Broidy Capital, through Kang as the Basic Cardmember,[2] submitted an application to add Mr. Broidy as an Additional Cardholder to the Broidy Capital account. (Compl. ¶ 16.) Less than 30 days later, in a letter dated February 21, 2025, American Express informed Kang, as the primary customer and person financially responsible for the Card accounts, that "we're unable to approve your request to issue an Additional Card on your account to the person indicated on your application." (Compl. ¶ 18; ECF 1-1.) The letter provided a phone number—to Kang—to contact American Express Customer Care if additional information was needed. (ECF 1-1.)

Plaintiff alleges that *he* (not Kang, the person to whom the above communication was directed) subsequently followed up with American Express several times for an explanation and was informed that he was rejected based on his history with American Express. (Compl. ¶¶ 20–37; June 23, 2025 Response Letter, ECF 1-4) Specifically, the Complaint alleges that on April 30, 2025, Plaintiff called and spoke with an American Express representative, Kia, who "told [Plaintiff] that Amex denied his credit application 'due to your history with Amex.'" (*Id.* ¶ 22.)

---

[2] A Basic Cardmember like Kang is "responsible for all use of the Account by Additional Cardmembers and anyone they allow to use the Account." (Decl. Ex. 1 at 3.) Under the 2024 Cardmember Agreement, Broidy Capital and the Basic Cardmember "must pay for all charges they make." (*Id.*). This is in contrast to an Additional Cardholder who "do[es] not have an account with [American Express.]" (*Id.*)

Plaintiff then allegedly spoke to an account supervisor named Maria, who also told Plaintiff "that Amex denied the credit application 'due to your history with Amex.'" (*Id.* ¶ 23.) Maria then allegedly connected Plaintiff with a representative in the specialist department, who told Plaintiff that he "was denied a credit card 'due to previous Amex cards.'" (*Id.* ¶ 26.)

On June 23, 2025, American Express further responded, in writing, to the May 7 and June 18, 2025 letters from Plaintiff's counsel. (*Id.* ¶ 32; ECF No. 1-4.) American Express's June 23, 2025 letter stated that "[a]n evaluation of your application was conducted and unfortunately our decline decision remains based on your history with American Express . . . [and] many factors taken into consideration . . . including . . . the status of any current or former American Express Accounts." (*Id.*)  One month later, on July 25, 2025, Broidy then filed the instant lawsuit.

Plaintiff's filing violates the terms of the applicable cardmember agreements. Under the terms of the "Claims Resolution" section of the 2024 Cardmember Agreement, "[b]efore beginning a lawsuit, mediation, or arbitration," Plaintiff was required "to send a written notice (a ***claim notice***) to each party against whom a claim is asserted, in order to provide an opportunity to resolve the claim informally or through mediation." (Decl. Ex. 1 at 8 (emphasis in original).) The claim notice was to "describe the claim and state the specific relief demanded," and "[w]ithin 30 days after sending or receiving a claim notice, you or we may submit the claim . . . for mediation." (*Id.*) The Claims Resolution section defines "Claim" broadly to mean:

> . . . . any *current or future claim*, dispute or controversy **relating to your Account(s)**, this Agreement, **or any agreement or relationship you have or had with us**, except for the validity, enforceability or scope of the Arbitration provision. Claim includes but is not limited to: (1) initial claims, counterclaims, crossclaims and third-party claims; (2) claims based upon contract, tort, fraud, statute, regulation, common law and equity; (3) claims by or against any third party using or providing any product, service or benefit in connection with any account; and (4) claims that arise from or relate to (a) any account created under any of the agreements, or any balances on any such account, (b) advertisements, promotions or statements related to any accounts, goods or services financed under any

accounts or terms of financing, (c) benefits and services related to card membership (including fee-based or free benefit programs, enrollment services and rewards programs) and (d) *your application for any account*.

(*Id*. (emphases removed; other emphases added).)

"You" and "your" are defined to mean the Basic Cardmember (Kang) and the Company (Broidy Capital) (*see* Decl. Ex. 1 at 1, 3), and the 2024 Cardmember Agreement provides that "[w]hen you or an Additional Cardmember, as defined below, use the Account (or sign or keep a card), you agree to the terms of the Agreement," (*id*. at 3 (emphasis added).) The 2024 Cardmember Agreement also expressly provides that the obligation is on the Basic Cardmember and Company to "tell Additional Cardmembers that . . . their use of the Account is subject to this Agreement." (Decl. Ex. 1 at 3.) The Claims Resolution section's scope reaches Claims by or against "any corporate parents, subsidiaries, affiliates or *related persons* or entities." (*Id.* at 8 (emphases removed; other emphasis added).)

The arbitration provisions within the Claims Resolution section in the 2024 Cardmember Agreement (the "Arbitration Agreement"), which American Express has invoked, state, in relevant part:

> You or we may elect to resolve any claim by individual arbitration. Claims are decided by a neutral arbitrator.
>
> If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim. Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. . . .
>
> * * *
>
> You or we may otherwise elect to arbitrate any claim at any time unless it has been filed in court and trial has begun or final judgment has been entered.
>
> Either you or we may delay enforcing or not exercise rights under this Arbitration provision, including the right to arbitrate a claim, without waiving the right to

-5

exercise or enforce those rights.

\* \* \*

. . . You and we agree that the arbitration will be confidential. You and we agree that we will not disclose the content of the arbitration proceeding or its outcome to anyone, but you or we may notify any government authority of the claim as permitted or required by law . . . .

\* \* \*

You may reject this Arbitration provision by sending a written rejection notice to us . . . . Your rejection notice must be mailed within 45 days after your first card purchase. Your rejection notice must state that you reject the Arbitration provision and include your name, address. Account number and personal signature. No one else may sign the rejection notice.

\* \* \*

This [Claims Resolution] section will survive termination of your Account, voluntary payment of your Account balance, any legal proceeding to collect a debt, any bankruptcy and any sale of your Account (in the case of a sale, its terms will apply to the buyer of your Account). . . .

(*Id*. (emphasis removed).) Kang and Broidy Capital both accepted the 2024 Arbitration Agreement in the 2024 Cardmember Agreement by activating and using their cards. (Decl. ¶ 9.)

Plaintiff is also bound to arbitrate his claim pursuant to the terms of the Commercial Account Application that Broidy Capital filled out when it first opened its account. Pursuant to that agreement, American Express Travel Related Services Company, Inc., a subsidiary of American Express Company, agreed to issue "Amex Accounts selected by Company [Broidy Capital], as applicable, to Company and/or the employees, consultants and contractors ('Employees') of the Company who are approved by Amex and/or its Affiliate and are designated and authorized by Company to incur legitimate business expenses on behalf of Company[.]" (Decl. ¶ 8; *id.* Ex. 2 at 4.) The Commercial Account Application contains an arbitration agreement covering any claim, dispute or controversy "between [Broidy Capital] and Amex arising from or

relating to this Agreement . . . or the relationship resulting" from it. (*Id.* Ex. 2 at 9.) Given that Plaintiff is the Chairman and CEO of Broidy Capital the obligation to arbitrate is clear.

Plaintiff also has a history as an American Express cardholder under various accounts. (Decl. ¶¶ 3, 14.)  At least three of Plaintiff's prior accounts were cancelled due to "not being used for its intended purpose."  (*See id.* ¶ 14; *id.* Exs. 4, 6–7.)[3]  These cancellations followed Plaintiff's guilty plea to a felony in 2020.  Change of Plea Hr'g Tr. at 80:5-22, *United States v. Broidy*, No. 20-cr-210 (D.D.C. Oct. 20, 2020), Dkt No. 13.   Plaintiff was pardoned thereafter. *See* Order of Dismissal, *United States v. Broidy*, No. 20-cr-210 (D.D.C. June 15, 2021), Dkt No. 18.[4]  Notably, the agreements governing Mr. Broidy's previously issued (and now-cancelled) American Express cards incorporate language that is materially identical to the 2024 Cardmember Agreement, including a clause stating that its arbitration provisions "will survive termination of your Account." (Decl. Ex. 3 at 4.)   American Express therefore relies on the arbitration provisions in those agreements as well, to the extent they are applicable to Plaintiff's claim.

The arbitration provisions in the 2024 Cardmember Agreement, the Commercial Account Application, and any other cardmember agreements together will be referred to herein as the "Arbitration Agreements."

---

[3] The Eleventh Circuit has held: "[A] court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). Plaintiff's relationship history with American Express is referenced repeatedly in the Complaint and its exhibits and lies at the heart of his ECOA lack-of-notice claim. (*See, e.g.*, Compl. ¶¶ 18, 20–32; ECF No. 1-4) Accordingly, the cancellation notices fall squarely within the incorporation-by-reference doctrine and may be considered by the Court.

[4] The court can take judicial notice of these facts. *See* Fed. R. Evid. 201(b). "A court need not accept as true allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Chapman v. Abbott Lab'ys*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013) (citations omitted); *see also Vallina v. Mansiana Ocean Residences LLC*, 2011 WL 11674441, at *9 (S.D. Fla. June 17, 2011) (Ungaro, J.) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("holding that a court is not required to accept as true conclusory allegations which are contradicted by" matters properly subject to judicial notice)).

### III.    ARGUMENT

**A.    Plaintiff's Claim is Subject to Mandatory Arbitration.**

The Eleventh Circuit treats a motion to compel arbitration as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Schriever v. Navient Sols., Inc.*, No. 2:14–cv–596, 2014 WL 7273915, at *2 (M.D. Fla. Dec. 19, 2014) (citations omitted). Accordingly, in ruling on a motion to compel arbitration, the Court may consider matters outside of the four corners of the complaint. *See, e.g.*, *Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1329 (S.D. Fla. 2009); *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir.2007).

The federal policy favoring arbitration agreements creates a strong presumption in favor of enforcement and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses J. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Consistent with the FAA, "courts must 'rigorously enforce' arbitration agreements according to their terms" so as to facilitate streamlined proceedings. *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (citation omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

Under the FAA, the Court must compel arbitration "upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Indus.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (citing 9 U.S.C. §§ 2–4). "The party opposing a motion to compel arbitration or to stay litigation pending arbitration has the affirmative duty of coming forward by way of affidavit or allegation of fact to show cause why the court should not compel arbitration." *Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1314 (S.D. Fla. 2004) (quotation marks and citation omitted).

1.    <u>The Arbitration Agreements are Valid and Enforceable Against Plaintiff</u>

Under Ordinary State Contract Law Principles.

The Arbitration Agreements are generally governed by Utah law (Decl. Ex. 1 at 7; *id.* Ex. 3 at 9), and therefore Utah law determines the validity of the Arbitration Agreements and their applicability to Plaintiff.[5] *See, e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (collecting cases). The Arbitration Agreements are valid and enforceable against Plaintiff under Utah law, which provides:

> A credit agreement is binding and enforceable . . . if: (i) the debtor is provided with a written copy of the terms of the agreement; (ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and (iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

Utah Code Ann. § 25-5-4(2)(e). Utah law also expressly allows parties to include arbitration provisions in open-end credit agreements. *See* Utah Code Ann. §§ 70C-4-102(b); *see also* 70C-4-105. Consistent with Utah law, American Express provided the primary cardmember a copy of the Arbitration Agreements (Decl. ¶ 6), and those Agreements clearly state that "[w]hen you or an Additional Cardmember . . . use the Account (or sign or keep the card), you agree to the terms of the Agreement." (*Id.* Ex. 1 at 3; *see also id.* Ex. 3 at 1.) The cardmembers (Kang and Broidy Capital) kept their cards, thereby accepting the terms of the applicable cardmember agreements. (*Id.* ¶¶ 9, 11.)

The fact that Kang and Broidy Capital—rather than Plaintiff himself—agreed to the

---

[5] The Corporate Commercial Services Account Agreement, while governed by New York law, is equally valid and applies to Plaintiff. *See Salerno v. Credit One Bank, NA*, No. 15-CV-516-JTC, 2015 WL 6554977, at *4 (W.D.N.Y. Oct. 29, 2015) (noting that "it is clear under New York law that regular use of a credit card constitutes sufficient evidence of the card user's consent to the terms of the agreement governing the account[,]" and compelling arbitration against a consumer where a financial institution provided evidence of its "compliance with its customary policy to enclose a copy of the Cardholder Agreement within the same envelop used to mail the customer the credit card."). That Agreement's arbitration provision is governed by the FAA. (*See* Decl. Ex. 2 at 10.)

applicable cardmember agreements does not alter the analysis. Plaintiff, the principal of Broidy Capital, alleges that he personally asked Kang "to obtain an additional credit card in Mr. Broidy's name" under Broidy Capital's American Express account. (*See* Compl. ¶ 16.) In other words, Plaintiff sought to benefit from the 2024 Cardmember Agreement by having himself named as an additional cardholder pursuant to the 2024 Cardholder Agreement's very terms. Signatory or not, as the company's principal, Plaintiff cannot both "claim the benefit of the contract and simultaneously avoid its burdens[,]" as doing so "would both disregard equity and contravene the purposes underlying enactment of the [FAA]." *Avila Grp., Inc. v. Norma J. of Cal.*, 426 F. Supp. 537, 542 (S.D.N.Y. 1977).[6]

For these reasons, the Arbitration Agreements are enforceable against Plaintiff.

### 2. The Arbitration Agreements Encompass Plaintiff's Claim.

Plaintiff's claim falls squarely within the scope of the Arbitration Agreements. The Arbitration Agreements encompass "any current or *future* claim, dispute or controversy relating to your Account(s), this Agreement, *or any agreement or relationship you have or had with us*." (Ex. 1 at 8, Ex. 3 at 3.) Furthermore, the Arbitration Agreements contain a survival clause providing that the Agreements "w[ould] survive termination of your Account[.]" (Ex. 1 at 9; Ex. 3 at 4.) Because Plaintiff's claim appears to arise from a decision to deny a supplemental card in Plaintiff's name under the Broidy Capital account based on Plaintiff's "history with American Express" (Compl. ¶ 34; *see also id.* ¶¶ 22, 26), his claim falls directly within the purview of the Arbitration Agreements.

---

[6] Utah law also recognizes and upholds the general contract principle that nonsignatories may be compelled to arbitrate when they seek the benefit of a contract containing an arbitration clause. *See, e.g.*, *Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, P19 & n.11 (2006) (citing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000) ("Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties.")).

-10

Moreover, the Arbitration Agreements expressly incorporate claims brought not only by the Basic Cardmember (Kang) and the Company (Broidy Capital), but also claims by "any corporate parents, affiliates, or related persons or entities." (Decl. Ex. 1 at 8; Ex. 3 at 3.) Because Plaintiff is Broidy Capital's Chairman and CEO (Compl. ¶ 12), he is plainly a "related person," (Decl. Ex. 1 at 8; Decl. Ex. 3 at 3)—indeed, as the ultimate decision-maker for the entity requesting the card he is much more. This same contractual provision authorizes American Express to compel arbitration of any controversy "relating to your Account" or "your application for any account." (Decl. Ex. 1 at 8; Decl. Ex. 3 at 3.) Plaintiff's claim, which apparently arises from Broidy Capital's attempt to add him to the Company's business account (Compl. ¶ 16, ECF No. 1-1), is therefore subject to mandatory arbitration. In short, the definitional breadth of "related person" and the scope of covered disputes make clear that American Express may insist that Plaintiff's claim be resolved in arbitration.

Finally, the United States Supreme Court has repeatedly affirmed that the FAA strongly favors the validity and enforceability of arbitration agreements. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013); *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532 (2012); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011). Because judicial policy favors the enforcement of arbitration provisions, and Utah law readily supports the validity and enforceability of the Arbitration Agreements against Plaintiff, the Court should compel arbitration here.[7]

---

[7] It is by now "clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). This includes claims under ECOA, which courts routinely find are subject to arbitration. *See generally Galloway v. Priority Imports Richmond, LLC*, 426 F. Supp. 3d 236, 241 (E.D. Va. 2019) (determining claim under section 1691(d) was subject to arbitration); *Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1338 (11th Cir. 2000) (holding section 1691(a)(3) claim under ECOA was subject to arbitration).

**B.      In the Alternative, Plaintiff's Complaint Must be Dismissed For Lack of Subject-Matter Jurisdiction and Failure to State a Claim under ECOA.**

If the Court does not compel arbitration it should dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

*Rule 12(b)(1) Attacks on Subject Matter Jurisdiction.* Under Rule 12(b)(1), "[a] party may raise a jurisdictional challenge in one of two ways: facially or factually." *Fernandez v. Crafty Seafood, Inc.*, No. 25-cv-80142, 2025 WL 1536913, at *1 (S.D. Fla. May 28, 2025) (Middlebrooks, J.). "Factual challenges 'can be decided without reference to the merits of the underlying claim and lie within the exclusive province of the trial court.'" *Id.* (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 924-25 (11th Cir. 2003)). In a factual challenge, "'no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional issue.'" *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

*Rule 12(b)(6) Motion for Failure to State a Claim.* Plaintiff can "survive a motion to dismiss" only if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Indeed, pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (alteration added). While a court construes the complaint in the light most favorable to the plaintiff and takes its factual allegations as true, *see Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citation omitted), legal conclusions do not benefit from this favorable reading. *See Iqbal*, 556 U.S. at 679; *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (holding that courts are not required to accept "allegations that are merely conclusory, unwarranted deductions of fact, or

-12

unreasonable inferences.") (citation omitted). A court need not "rely on visible fiction." *Baker v. City of Madison*, 67 F.4th 1268,1278 (11th Cir. 2023) (citation and quotation marks omitted).

The Complaint does not meet these standards and must be dismissed for multiple independent reasons. *First*, the Court lacks subject-matter jurisdiction to adjudicate Plaintiff's claims since, in a doomed effort to avoid application of the arbitration provision, he purports to vindicate interests of a supposed third party (Broidy Capital) not before the Court. Relatedly, as pled, Plaintiff is not an "applicant" under the ECOA; Broidy Capital (through Kang) applied for Plaintiff to be a secondary cardmember. *Second*, American Express satisfied ECOA's notice requirements when it advised Plaintiff that he could not be a secondary cardmember due to his "history with American Express." Each reason independently requires dismissal with prejudice.

1.      <u>Plaintiff is Not an "Applicant" Under ECOA and Thus Lacks Article III and Statutory Standing.</u>

Plaintiff lacks both Article III standing and statutory standing under ECOA.

a.      *Plaintiff Lacks Article III Standing.*

Plaintiff has not demonstrated Article III standing, which limits federal jurisdiction to actual "cases" and "controversies." Even if the Article III requirements are met, moreover, Plaintiff is not the proper party to litigate because the claim rests on third-party rights belonging to Broidy Capital, not Plaintiff.

To establish standing, "[a] litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023). As the party "invoking federal jurisdiction," Plaintiff "bears the burden of establishing these [standing] elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy the injury-in-fact requirement, plaintiff's injury needs to be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or

-13

hypothetical." *Id.* at 560 (citations omitted).

Plaintiff does not meet these requirements. Plaintiff asserts a claim premised on American Express's purported failure to submit proper notices in compliance with the procedural requirements of ECOA. But by Plaintiff's own admission, he did not apply for his own card or even submit the application to be an additional cardholder under the Broidy Capital account; instead, Broidy Capital, through Kang, applied.[8] Thus, to the extent that American Express violated anyone's ECOA notice rights—and it did not—those rights belong to Broidy Capital or Kang, not Plaintiff. *Cf. Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."). In other words, Plaintiff fails to allege a personally held injury traceable to American Express.[9]

### b.    *Plaintiff Lacks Statutory Standing under ECOA.*

As discussed above, the Act provides a private right of action only to an "applicant," which means "any person who *applies* to a creditor *directly* for an extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(b) (emphasis added). Credit, in turn, is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* § 1691a(d). The Complaint makes clear that

---

[8] To the extent Plaintiff may argue that he was the "applicant" for the Basic Card as the principal of Broidy Capital, such admission would be conclusive of his obligation to arbitrate pursuant to the clear terms of the 2024 Cardmember Agreement and Commercial Account Application.

[9] Prudential standing considerations preclude a party from raising the rights of others except in unique circumstances where there is a "hindrance" to the injury-holder's ability to protect its interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *see also Yellowhammer Fund v. Marshall*, 776 F. Supp. 3d 1071, 1093 (M.D. Ala. 2025) (collecting cases). Because Plaintiff makes no showing regarding why Broidy Capital or Kang could not vindicate their own interests, he lacks both constitutional and prudential standing to pursue his claim.

Kang—not Plaintiff—submitted the denied credit application and is therefore the only party who could ostensibly seek relief under ECOA. (*See* Compl. ¶¶ 16, 20, ECF No. 1-1.)

The Eleventh Circuit has held, in discussing section 1691a(b), that "the ordinary meaning of the term 'applicant' is one who requests credit to benefit himself." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1191 (11th Cir. 2019); *cf. Applicant*, Black's Law Dictionary (defining "Applicant" as "[s]omeone who requests something; a petitioner . . . ."). This interpretation of ECOA also comports with decisions from other circuits. *See Hawkins v. Cmty. Bank of Raymore* 761 F.3d 937, 941 (8th Cir. 2014) ("the plain language of ECOA unmistakably provides that a person is an applicant *only if she requests credit*.") (emphasis added); *accord Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007) (there "is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor . . . [and] to interpret 'applicant' as embracing 'guarantor' opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept").

Here, Plaintiff is not an "applicant" under ECOA. The request made by Kang was not to benefit Plaintiff—any potential benefit deriving from the request was to Broidy Capital by virtue of adding an Additional Cardholder to its existing credit account. Again, under the 2024 Cardmember Agreement, only Broidy Capital and the Basic Cardmember (Kang) would be "responsible for all use of the Account by Additional Cardmembers" and "must pay for all charges [Additional Cardmembers] make." (Ex. 1 at 3.)

Plaintiff has no claim under ECOA because he does not adequately allege that he ever applied for anything to have standing as an "applicant" under the Act.

2.     American Express Provided the "Notice" Required by ECOA.

Plaintiff also fails to state an inadequate notice claim under section 1691(d). As a threshold matter, Plaintiff has not alleged a discrimination claim, and the Eleventh Circuit has "never

addressed whether § 1691 provides an independent cause of action" divorced from a discrimination claim. *See Barat v. Navy Fed. Cred. Union*, 127 F.4th 833, 836 n.1 (11th Cir. 2025). Regardless, American Express's correspondence with Kang and Plaintiff complied with ECOA's notice provision as a matter of law, putting Plaintiff on notice of precisely why an additional corporate card in his name was denied by citing to his "history with American Express[.]" (Compl. ¶ 34; *see also id.* ¶¶ 22, 26.)

ECOA requires "creditors" to provide "applicants" with reasons for "adverse actions" taken against them to "discourage[ ] discrimination and [ ] educate consumers as to the deficiencies in their credit status." *See Barat*, 127 F.4th at 836 (internal quotation marks omitted) (citing *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 977 (7th Cir. 2004)); *see also* 15 U.S.C. § 1691(d)(2). A statement of reasons is sufficient if it includes the specific reasons for the adverse action. § 1691(d)(3). "Whether an individual applicant actually finds the notice 'educational' or 'helpful' is irrelevant in assessing the sufficiency of the statutory notice." *Aikens v. Nw. Dodge, Inc.*, No. 03 C 7956, 2006 WL 59408, at *5 (N.D. Ill. Jan. 5, 2006). And certainly Plaintiff knew that his "history" includes his prior relationship with American Express, which was cancelled following his felony conviction in 2020.

The Consumer Financial Protection Bureau's ("CFPB") implementing regulations ("Regulation B") confirm that the notice "must be specific and indicate the principal reason(s) for the adverse action." 12 C.F.R. § 1002.9(b)(2). In drafting the notice provision, Congress "intended [it] to operate in a sensible and flexible way" and did "not expect or intend that statements of reasons be given in the form of long, detailed personal letters." 147 S. Rep. No. 94–589, 94th Cong., 2d Sess., 1976 WL 13838, at *8. Indeed, the CFPB has explained that "[a] creditor need not describe how or why a factor adversely affected an applicant. For example, the notice may

simply say 'length of residence' rather than 'too short a period of residence.'" Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.9(b)-3.

Here, American Express's statement of reasons was adequate as a matter of law to put Plaintiff on notice of why a supplement card in his name under the Company's card account was denied. American Express advised that Plaintiff's "history with American Express" foreclosed his request to be added as an additional cardmember. (May 7, 2025 Letter, ECF No. 1-2 at 2–3.) Plaintiff may feign confusion now regarding his history with American Express (*see id.* ¶ 22), but he is well-aware of his prior account closures, related documentation of which is incorporated by reference into his Complaint. (*See* Decl. Exs. 4–7.)

American Express's statement of reasons complied with the letter and spirit of the ECOA's notice provision, which was also meant to give credit applicants recourse when creditors rely on "misinformation or inadequate information." 147 S. Rep. No. 94–589, 94th Cong., 2d Sess., 1976 WL 13838, at *4. By informing Plaintiff that it declined to issue an additional corporate card under the Broidy Capital account in his name because of his prior relationship history with American Express, which is well-known to him, American Express dispelled any suggestion that its decision was based on discrimination or on faulty or insufficient information—the very harms the ECOA notice provision is designed to prevent.

## IV.   CONCLUSION

For the foregoing reasons, American Express respectfully requests that the Court grant this Motion and enter an order compelling Plaintiff to arbitrate his dispute against American Express and dismissing the action. In the alternative, American Express respectfully requests that the Court dismiss Plaintiff's action with prejudice for lack of standing and for failure to state a claim upon

which relief can be granted.

## <u>LOCAL RULE 7.1(a)(3) CERTIFICATION</u>

I HEREBY CERTIFY that undersigned counsel attempted in good faith to confer by videoconference call on August 26, 2025 with counsel for Plaintiff regarding the primary relief sought herein—to compel arbitration. On that call, Plaintiff's counsel indicated Plaintiff was unwilling to stipulate to arbitration at that time but would review the arbitration language and requested a copy.   Counsel for American Express provided Plaintiff's counsel with a copy of the 2024 Cardmember Agreement immediately following the call.  Since then, Plaintiff's counsel has not contacted undersigned counsel to update its position.

Dated: August 27, 2025

Kelly A. Carrero (*pro hac vice pending*)
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326 8391
Facsimile: (212) 755 7306
kacarrero@jonesday.com

Respectfully submitted,

*/s/ Eliot Pedrosa*
Eliot Pedrosa (Fla. Bar No. 182443)
Sarah E. Morgado (Fla. Bar No. 1026053)
Ephraim D. Abreu (Fla. Bar No. 1019147)
JONES DAY
Brickell World Plaza
600 Brickell Avenue, Suite 3300
Miami, FL, 33131
Telephone: 305-714-9700
Facsimile: 305-714-9799
Email: epedrosa@jonesday.com
Email: smorgado@jonesday.com
Email: eabreu@jonesday.com

*Attorneys for Defendants American
Express Company and American Express
National Bank*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 27, 2025, a true and correct copy of the foregoing Motion to Dismiss Complaint and accompanying papers were filed using the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Eliot Pedrosa*
Eliot Pedrosa
*Attorney for Defendants*
