### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

CASE NO.: 9:25-CV-80930-DIMITROULEAS

ELLIOTT BROIDY,

     *Plaintiff*,

v.

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS NATIONAL BANK,

     *Defendants*.

## PLAINTIFF ELLIOTT BROIDY'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Elliott Broidy hereby opposes the motion to dismiss ("MTD") (Doc. 10) filed by

Defendants American Express Company and American Express National Bank (together "Amex").

### BACKGROUND

Broidy brought this action against Amex for violating the notice requirement of the Equal

Credit Opportunity Act ("ECOA").  Under ECOA, a person denied credit is "entitled to a statement

of reasons for such action from the creditor."  15 U.S.C. § 1691(d)(2).  The creditor's statement of

reasons complies with ECOA "only if it contains the specific reasons for the adverse action taken."

*Id*. § 1691(d)(3).  Here, Amex did not provide a specific reason—or a truthful one.

Broidy applied for an Amex card in February 2025.  Compl. ¶ 16 (Doc. 1).  Amex turned

him down, but it didn't say why.  Compl. ¶¶ 17–19 & Ex. A (Doc. 1-1).  In May 2025, Broidy sent

Amex a letter requesting the ECOA-required statement of reasons.  Compl. ¶¶ 28–30 & Ex. B

(Doc. 1-2).  Amex ignored him.  Compl. ¶ 30.  After Broidy sent a second letter, Compl. ¶ 31 &

Ex. C (Doc. 1-3), Amex finally told him in June 2025 that its "decline decision [was] based on

your history with American Express."  Compl. ¶¶ 32, 34 & Ex. D (Doc. 1-4).  That statement

violated ECOA's notice requirement for at least two reasons.  First, Amex did not provide a *specific* reason for its decision.  *See* Doc. 1-4.  Second, Amex did not disclose its *actual* reason for denying Broidy credit.

The truth now has come out.  Amex's motion reveals that the real reason it denied Broidy credit is that, for a brief period of time, he had a federal criminal record.  In October 2020, Broidy pleaded guilty to failing to register under the Foreign Agents Registration Act.  *See United States v. Broidy*, No. 1:20-cr-210-CKK (D.D.C.).  Three months later, before sentencing, he received a full pardon from the President.  *See infra* at 15–16 & n.4.  The criminal case, Amex now admits, is the reason it denied Broidy credit.  *See* MTD at 2, 7, 16.

But that is not what Amex told Broidy back in June.  After providing no reason for months, and after considerable prodding, Amex finally told Broidy that the reason was his "history with American Express."  Compl. Ex. D (Doc. 1-4).  That, we know now, was false.  Amex decided not to do business with Broidy because of his short-lived criminal case that was unrelated to his "history with" Amex.  And it did so even though Broidy received a presidential pardon.

## ARGUMENT

### I.    Broidy Is Entitled to Have This Court, Not an Arbitrator, Decide His Case.

Broidy has a right to have his case decided by this Court, not an arbitrator who lacks Article III's guarantees of independence and impartiality.  Amex's bid to consign this case to an arbitrator's tender mercies fails for three main reasons.  First, Broidy is not a signatory to the arbitration agreement—Broidy Capital Holdings ("BCH") was.  Broidy thus never consented to arbitrate claims with Amex, and he does not consent to do so now.  Second, Broidy is not suing Amex for violating the contract.  He is suing under a federal statute, ECOA, which gives him notice rights that belong to him as an individual.  Third, Amex waived its claim for arbitration in any event by filing a motion to dismiss Broidy's ECOA claim *on the merits*.

**A.      Broidy Is Not a Signatory to the Amex Agreement and Is Suing Under ECOA, Not the Agreement.**

Amex may not force involuntary arbitration upon Broidy.  In our system of justice, "a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).  That is so because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83 (2002) (cleaned up).  Arbitration is always "a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ*., 489 U.S. 468, 479 (1989).  Here, BCH is a party to the Agreement, but Broidy is not.  This matters.  "It goes without saying that a contract [of arbitration] cannot bind a nonparty." *EEOC v. Waffle House, Inc*., 534 U.S. 279, 294 (2002).

Eleventh Circuit precedent confirms that Broidy has a right to his day in court, not an arbitrator's conference room.  In *Lubin v. Starbucks Corp*., 122 F.4th 1314 (11th Cir. 2024), Lubin, the husband of a former Starbucks employee, sued Starbucks alleging that it sent him a deficient health-insurance notice under COBRA.  *Id*. at 1317.  Starbucks moved to compel arbitration under his wife's employment agreement, which stated:  "Starbucks and I agree to use binding individual arbitration to resolve any 'Covered Claims' … 'Covered Claims' are those brought under any statute … relating to my employment, including those concerning any element of compensation … or termination of employment."  *Id*. at 1318.  The district court denied Starbuck's motion to compel arbitration because "Lubin was neither a party to his wife's employment agreement nor did he sue to enforce the employment agreement.  Instead, Lubin sought to enforce his own, statutory right to an adequate COBRA notice."  *Id*.

The Eleventh Circuit affirmed.  It agreed with Lubin that, "because he never signed an arbitration agreement with Starbucks, he is not required to arbitrate a matter concerning his rights

under federal law." *Id*. at 1319.  And, "[b]ecause he was not a party to the agreement, the Court cannot compel him to adhere to the terms of the agreement." *Id*.  Lubin, the Court noted, "seeks to vindicate *his* rights, not his wife's." *Id*. (emphasis in original).  The Court also rejected various arguments made by Starbucks that Amex has not raised here.  *See id*. at 1319–24.

In a concurring opinion, Judge Tjoflat underscored the importance of the nature of Lubin's claim:  "This is a statutory case: Lubin sues to enforce a federal statutory right, the right to an adequate COBRA notice.  His claim is not the product of any bargained-for exchange with Starbucks.  That is why Starbucks cannot compel him to arbitrate under an agreement that is not his own." *Id*. at 1324–25 (Tjoflat, J., concurring) (citations omitted).

As in *Lubin*, so too here.  Broidy "never signed an arbitration agreement with" Amex, and "he is not required to arbitrate a matter concerning his rights under federal law." *Id*. at 1319 (majority opinion).  He sues to vindicate his right to an adequate ECOA notice, which is a right personal to him that comes from federal law, not from any contract between Broidy and Amex.

Amex relies on Utah law (MTD at 9), but Utah law dovetails with the analysis in *Lubin*. "In order to require a party to submit to arbitration, there must be an agreement to arbitrate." *Ellsworth v. Am. Arbitration Ass'n*, 148 P.3d 983, 987 (Utah 2006).  And Utah law requires "direct and specific evidence of an agreement between the parties." *Id*. (quotation marks omitted).  Such an agreement must be "between the *particular* parties" who would be sent off to arbitration.  *Id*. at 988 (emphasis in original).  Thus, a person such as Broidy "who has not manifested assent to an agreement to arbitrate cannot be required to submit to arbitration." *Id*. at 989.

The parties to the signed Agreement with Amex are Andrew Kang and BCH. *See* Hernandez Decl. Ex. 1 (Doc. 11-1 at 2).[1] The Agreement states that "***You*** and ***your*** mean the Basic Cardmember and the Company. You agree, jointly and severally, to be bound by the terms of this Agreement." *Id*. at 4. Mr. Kang (the cardmember) and BCH (the company) agreed to be bound by the Agreement. Broidy did not.

Amex improperly injects into the case a heavily redacted previous arbitration agreement alleged to be between Amex and BCH, *see* MTD at 6–7 & Hernandez Decl. Ex. 2 (Doc. 11-2), but Amex has not shown that Broidy was a party to that agreement. And Exhibit 2 is not the agreement under which Broidy applied for an additional card. Thus, the previous arbitration agreement (which Amex hesitantly offers only "to the extent" it is applicable, MTD at 7) changes nothing.

### B.     There Is No Presumption in Favor of Forcing a Non-Signatory to Arbitrate.

Amex is wrong to suggest that "[t]he federal policy favoring arbitration agreements creates a strong presumption in favor of enforcement" here. MTD at 8. As the Supreme Court recently explained, "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc*., 596 U.S. 411, 418 (2022). "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id*. "And indeed, the text of the FAA makes clear that courts are not to create arbitration-specific rules" that "tilt the playing field in favor" of arbitration. *Id*. at 419.

Broidy argues here that, as a non-signatory suing to vindicate his federal statutory rights, he is not bound by Amex's arbitration agreement with Mr. Kang and BCH. That argument must be judged without applying any pro-arbitration presumption. *See Lubin*, 122 F.4th at 1319 (district

---

[1] Citations to the exhibits in Doc. 11 are to the page number assigned by this Court's electronic-filing system, rather than any internal pagination.

court did not err by allegedly "'ignor[ing] the strong presumption in favor of arbitration'" where the party opposed to arbitration "counter[ed] that he is not a party to the arbitration agreement" (second brackets added)).

> **C.     The Equitable Estoppel Doctrine Has Not Been Raised by Amex or Applied by Utah Courts Against Non-Signatories and Does Not Apply Here in Any Event.**

In a one-sentence footnote, Amex seems to reference the equitable estoppel doctrine under Utah law.  *See* MTD at 10 n.6.  But arguments made in "a perfunctory manner" are waived, *In re Ellingsworth Residential Cmty. Ass'n, Inc.*, 125 F.4th 1365, 1377–78 (11th Cir. 2025), especially when the undeveloped argument appears in a footnote.  "If a party makes only a passing reference to an argument in a footnote of its brief, the argument is waived."  *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1336 n.5 (11th Cir. 2025) (cleaned up).  It will be too late for Amex to raise an estoppel argument in its reply brief.  "Just as undeveloped arguments are waived, so are arguments raised for the first time in reply briefs."  *United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023), *cert. denied,* 144 S. Ct. 1046 (2024).

Even if Amex had timely and properly developed the argument, it would fail.  For one thing, "the nonsignatory estoppel exception has never been applied in Utah."  *Ellsworth*, 148 P.3d at 989 n.11.  The Utah Supreme Court has "never formally adopted that principle" but only "suggested that it might be used to require a nonsignator to arbitrate when the contract it seeks to enforce contains an arbitration provision."  *Gold's Gym Int'l, Inc. v. Chamberlain*, 471 P.3d 170, 179 (Utah 2020).  That suggestion does not apply here, since Broidy does not seek "to enforce [a contract that] contains an arbitration provision."  *Id*.  He seeks to enforce ECOA.

Indeed, both the Eleventh Circuit in *Lubin* and the Utah courts have rejected equitable estoppel for reasons that require its rejection here as well.  In *Lubin*, the Eleventh Circuit explained: "Equitable estoppel does not compel Lubin to submit to arbitration because he is not suing to

6

enforce or avoid any provision of his wife's employment agreement.  Lubin is not claiming the benefits of the agreement while simultaneously attempting to avoid its burdens.  Rather, Lubin sues based on Starbuck's failure to fulfill its notice duties under COBRA.  Those notice duties do not arise out of any provision of his wife's employment contract." *Lubin*, 122 F.4th at 1321 (citations omitted).

A non-signatory estoppel argument also failed in *Ellsworth*, where the Utah Supreme Court held that the doctrine cannot bind "a nonsignatory who is not suing on the contract and who has not received direct benefits from the contract."  148 P.3d at 989.  Here, as well, Broidy, a non-signatory, is "not suing on the contract."  He is suing under ECOA.  And he "has not received direct benefits from the contract."  There is no contract.  Amex *denied* him a credit card.[2]  Thus, the non-signatory estoppel doctrine, if it can ever apply under Utah law against non-signatories, does not apply here for the reasons stated in *Ellsworth* (and *Lubin*).  *See also Solid Q Holdings LLC v. Arenal Energy Corp.*, 362 P.3d 295, 299 (Utah Ct. App. 2015) (following *Ellsworth* and rejecting non-signatory estoppel doctrine because "Solid Q did not sign the Consulting Agreements containing the arbitration provision and never sued Arenal on those agreements" and was not alleged to have benefitted from the agreements).

Amex's other arguments fail too.  Amex's arbitration agreement purports to bind Mr. Kang, BCH, and "related persons."  Doc. 11-1 at 9.  But Utah courts have noted that "a signatory may not estop a nonsignatory from avoiding arbitration *regardless of how closely affiliated* that

---

[2] In *Ellsworth*, the arbitration provision was in a home repair contract.  Mr. Ellsworth was not a direct beneficiary of that contract even though he lived in the home, which his wife owned.  The Supreme Court ruled that "he has not received any direct benefit from the contract.  His occupancy of a repaired home of which he was not an owner is not a direct benefit, but an indirect one[.]"  148 P.3d at 989.  So too here, Broidy may receive indirect benefits from the Kang/BCH contract with Amex, but not direct benefits.

nonsignatory is with another signing party." *Solid Q Holdings*, 362 P.3d at 298 (emphasis added) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.,* 345 F.3d 347, 361 (5th Cir. 2003)).  Other Judges in this District, citing *Bridas*, have similarly held that nonsignatories to an arbitration agreement cannot be forced through estoppel to arbitrate even if they are closely related to the signatory.  *See, e.g., Tate v. Ibis Prop. Owners Ass'n, Inc*., No. 17-81005-CV-Middlebrooks, 2018 WL 11585481, at *6 n.4 (S.D. Fla. Feb. 20, 2018).  Thus, regardless of any close affiliation or related-person status between BCH and Broidy, Broidy is not estopped because he is not a signatory to the Amex agreement and not suing on that contract.

>    **D.   Amex Has Waived Any Right to Arbitration It Might Have Had by Seeking Dismissal on the Merits.**

A party may waive (or forfeit) its right to arbitration by its conduct, including its litigation conduct.  *See*, *e.g*., *Morgan*, 596 U.S. at 418–19.  Here, assuming *arguendo* that Amex had a right to foist arbitration on an unwilling Broidy, it waived that assumed right by choosing to file a merits-based motion to dismiss.

*Davis v. White*, 795 F. App'x 764 (11th Cir. 2020), so holds.  In *Davis*, the Eleventh Circuit held that a party waives its right to arbitrate by filing a motion to dismiss on merits-based grounds, because in doing so a party "act[s] inconsistently with its right to arbitrate." *Id*. at 768.  To be sure, as the Court explained, "not every motion to dismiss is inconsistent with the right to arbitration." *Id*. at 769 (cleaned up).  "Motions to dismiss may not be inconsistent with an agreement to arbitrate where the party seeks dismissal on non-merits grounds, where the party seeks dismissal of a frivolous claim, or where the motion seeks to separate arbitrable from non-arbitrable claims." *Id*. (citations omitted).  Amex's motion did not limit itself to seeking such things. *Davis* went on to explain that a motion to dismiss is inconsistent with a desire to arbitrate where, as here, it seeks

"to resolve the parties' entire dispute on the merits." *Id*. Such a motion waives the right to arbitrate because it "represent[s] a substantial invocation of the litigation process." *Id*. at 769–70.

Here, Amex seeks dismissal of Broidy's entire case on the merits. Amex argues that its statement that it denied Broidy credit based on "[his] history with American Express," Doc. 1-4, complied with ECOA's notice requirement, which is the ultimate merits question to be decided in this case. *See* MTD at 2–3, 13, 15–17. Amex asks this Court to "dismiss Plaintiff's action with prejudice" for "failure to state a claim upon which relief can be granted." *Id*. at 17–18. Thus, under *Davis*, Amex has waived its claimed right to arbitrate by seeking a merits-based dismissal.

*Davis* held that the party opposed to arbitration in that case was prejudiced by the conduct of the pro-arbitration party. *See Davis*, 795 F. App'x at 770 (being forced to spend resources to oppose a motion to dismiss constitutes prejudice). But the Supreme Court in *Morgan* subsequently did away with the prejudice requirement. *See Morgan*, 596 U.S. at 417 (holding that it is "wrong to condition a waiver of the right to arbitrate on a showing of prejudice"). Broidy has been prejudiced in the same way the party in *Davis* was, but this is of no moment because, after *Morgan*, waiver does not depend on prejudice. In short, by seeking to dismiss on the merits, Amex waived its simultaneous request to compel arbitration.

## II.  Broidy Has Both Article III Standing and Statutory Standing.

Having failed to show this case must be arbitrated, Amex next tries to get the case dismissed for lack of subject matter jurisdiction. This attempt does not persuade.

Amex's standing argument largely turns on its erroneous belief that (1) Broidy had to apply for his own card or fill out the paperwork himself or (2) be contractually liable to Amex upon receiving credit to have Article III or statutory standing. Amex errs on both points.

Article III standing requires "[1] an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is [2] fairly traceable to the challenged

conduct and [3] likely to be redressed by the lawsuit." *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1329 (11th Cir. 2025) (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)).

Broidy has standing.  By its terms, ECOA applies to "any aspect of a credit transaction." 15 U.S.C. § 1691(a).  Credit is defined as the "right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* § 1691a(d).  The term means what it says.  In explaining a functionally equivalent definition of credit under the Truth in Lending Act, the Supreme Court explained that "a credit card company such as American Express extends credit to an individual or an organization when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases." *Am. Exp. Co. v. Koerner*, 452 U.S. 233, 241 (1981) (discussing 15 U.S.C. § 1602(e)).  When Broidy applied for an additional card, he was an applicant because he was seeking access to Amex's credit.  When Amex denied him access, he experienced an adverse action, 15 U.S.C. § 1691(d)(6), that triggered ECOA's requirement that Amex provide Broidy with a "statement[] of reasons in writing," *id.* § 1691(d)(2)(A).  The denial without adequate notice is an injury in fact not only fairly traceable to Amex, but directly so.  And ECOA redresses such injuries by giving a cause of action to an "aggrieved applicant" for a creditor's violation of "*any* requirement imposed under" ECOA.  *Id.* § 1691e(a) (emphasis added).

Indeed, Amex itself expressly recognized Broidy as an "applicant" in its February letter denying his credit card application.  Amex invited Broidy—whom it referred to as "the Additional Card applicant"—to call Amex at a provided phone number "[i]f the Additional Card applicant would like to know the reason for our decision[.]"  Compl. Ex. A (Doc. 1-1).  Amex again acknowledged Broidy as an applicant in its June letter, which stated that "[a]n evaluation of *your*

*application* was conducted" and that "[t]he actions taken on *your application* were based on valid reasons[.]" *Id*. Ex. D (Doc. 1-4) (emphases added).

To be sure, Amex now hums a different tune in litigation. But it was right the first time. In arguing otherwise, Amex suggests that Broidy was not an applicant after all since Andrew Kang, his operations manager, filled out the paperwork for him. But that's wrong. Broidy told Kang to "obtain an additional credit card in Mr. Broidy's name." Compl. ¶ 16 (Doc. 1). Under Florida law, an agent's "acts are the acts of the principal." *Aero Techs., LLC v. Lockton Companies Int'l, Ltd.*, No. 09-20610-CIV, 2011 WL 7657475, at *3 (S.D. Fla. Apr. 25, 2011) (quoting *Richard Bertram, Inc. v. Sterling Bank & Tr.,* 820 So.2d 963, 965 (Fla. 4th DCA 2002)), *aff'd*, 467 F. App'x 824 (11th Cir. 2012). The same is true in Utah. *See Smith Table Co. v. Madsen*, 84 P. 885, 887 (Utah 1906). Here, at Broidy's direction, Kang filled out the paperwork for Broidy to obtain an additional card. Thus, under basic principles of agency law, Broidy himself applied to Amex for access to the credit that Amex had extended to BCH. The Court should reject Amex's implicit suggestion that principles of agency law that govern everywhere else don't apply to ECOA.

Amex's next attempt to avoid the clear import of the statute fares no better. Broidy cannot be an applicant, Amex argues, because he sought to get a card for his work for BCH whereas an applicant is "one who requests credit to benefit himself." MTD at 15 (quoting *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1191 (11th Cir. 2019)). But Broidy sought an additional card because having one would benefit him in his work for BCH, the firm where he serves as both Chairman and CEO. Compl. ¶¶ 12, 16 (Doc. 1). Amex cites no case suggesting that a person who seeks a corporate credit card to use in his corporate duties cannot be an applicant under ECOA.

Equally unavailing is Amex's bizarre claim that Broidy cannot be an applicant because, under the cardmember agreement, BCH and Kang would be responsible for any charges Broidy

made on his additional card.  MTD at 15.  Nothing in ECOA says an applicant must be personally responsible for credit.  The relevant question is whether Amex would be extending credit by giving Broidy a card in his name.  *Cf. Baker v. Am. Exp. Travel Related Servs. Co.*, No. CIV. 02-26-JBC, 2002 WL 1205065, at *2 n.3 (W.D. Ky. May 28, 2002) ("The fact that the plaintiff's liability to the defendant was perhaps only secondary or contingent is immaterial; the card member agreement shows that the defendant was nevertheless extending credit to the plaintiff.").

There is no serious question that it would.  An "[a]pplicant" is "any person who requests or who has received an extension of credit from a creditor[.]"  Regulation B, 12 C.F.R. § 202.2(e); 12 C.F.R. § 1002.2(e).[3]  And while an applicant is certainly broad enough to "include[] any person who is or may become contractually liable regarding an extension of credit," *id.*, nothing in the statutory or regulatory definition of "applicant" *requires* contractual liability.  After all, under the "traditional rules of statutory construction, … the word *include* does not ordinarily introduce an exhaustive list."  *United States v. Lange*, 862 F.3d 1290, 1295 (11th Cir. 2017).  "Congress' choice of words is presumed to be deliberate," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013), and if Congress wanted to limit the meaning of "applicant" to include only persons contractually liable to creditors, it knew how to do so.  *Thompson v. United States*, 145 S. Ct. 821, 827 (2025).  But Congress did no such thing.  The Court should reject Amex's invitation to read into ECOA's definition of "applicant" a contractual-liability requirement that isn't there.  The conclusion that giving Broidy a credit card would be extending him credit is the only one that makes sense under the facts.  If—as Amex wrongly suggests—Broidy were not an applicant, then

---

[3] Regulation B, which implements ECOA, was originally issued by the Board of Governors of the Federal Reserve System and later repromulgated by the Consumer Financial Protection Bureau. *Regions Bank*, 936 F.3d at 1207 n.9 (Rosenbaum, J., concurring in part and dissenting in part).

there would be no reason whatsoever for Amex to provide *Broidy's* history with Amex as its vague reason for denying Broidy access to credit.

In short, Broidy was an applicant when he sought access to Amex's credit—even though he relied on an agent to fill out the paperwork, even though Broidy would have only been benefited in his corporate capacity, and even though others would have been contractually liable to Amex had Broidy's application been accepted. Broidy thus has Article III and statutory standing to challenge Amex's failure to provide him notice of the reasons for denying his claims.

The fact that Broidy's Complaint states a claim for relief under ECOA, *see* Part III, *infra*, proves that he has statutory standing. "The question" pertinent to statutory standing "is whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami,* 581 U.S. 189, 196–97 (2017). "In answering that question, we presume that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id*. at 197 (cleaned up). Here, Broidy has a cause of action under ECOA and so has statutory standing.

ECOA, moreover, authorizes any "aggrieved applicant" to file suit. 15 U.S.C. § 1691e(a), (b), (c). And the use of the term "'aggrieved' reflects a congressional intent to confer standing broadly." *Bank of Am.*, 581 U.S. at 197–98; *see also FEC v. Akins*, 524 U.S. 11, 19 (1998) ("History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly[.]" (collecting cases)). Broidy is aggrieved because Amex deprived him of his "entitle[ment]" under ECOA to written notice of the specific—and actual—reason that Amex denied him credit. 15 U.S.C. § 1691(d)(2). *See also Chen v. Chase Bank USA, N.A*., 393 F. Supp. 3d 850, 852–55 (N.D. Cal. 2019) (holding that the plaintiff had statutory standing to bring an ECOA notice claim where the defendant bank told him that it denied him credit based on his

"[p]revious unsatisfactory relationship with this bank").  In sum, Broidy has statutory as well as

constitutional standing to bring this action.

**III.    Broidy has stated a claim under ECOA that Amex did not provide "specific reasons" for denying him credit and did not disclose its actual reason.**

Just as Amex is wrong on standing, Amex is wrong to suggest the facts pleaded by Broidy

do not state a claim for relief under ECOA's notice requirement.  *See* 15 U.S.C. §§ 1691(d)(2)–

(d)(3); Regulation B, 12 C.F.R. § 202.9(b)(2); 12 C.F.R. § 1002.9(b)(2).  A motion to dismiss fails

where, as here, the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

ECOA required Amex to provide a written statement of "the specific reasons" for its denial

of Broidy's credit application.  15 U.S.C. § 1691(d)(3).  Amex failed to comply with that notice

requirement.  Rather than provide the specific and actual reason for its adverse action on Broidy's

application, as it was legally required to do, Amex instead gave Broidy the brush-off.  It told him

only that his application for credit was denied because of his unspecified "history with American

Express."  Doc. 1-4.  That hopelessly vague and meaningless statement conveyed no information

to Broidy and is thus not a valid statement of reasons under ECOA.  Given this, Amex's assertion

that it "provided the 'notice' required by ECOA," MTD at 15 (heading), cannot be taken seriously.

Indeed, Amex's statement was "at best excessively vague." *Fischl v. Gen. Motors*

*Acceptance Corp.*, 708 F.2d 143, 148 (5th Cir. 1983).  And that too violates ECOA.  As the

Consumer Financial Protection Bureau ("CFPB"), which enforces ECOA, has explained:

"Because it is unlawful for a creditor to fail to provide a statement of specific reasons for the action

taken, a creditor will not be in compliance with the law by disclosing reasons that are *overly broad,*

*vague, or otherwise fail to inform the applicant of the specific and principal reason(s) for an*

*adverse action*." CFPB, Consumer Financial Protection Circular 2023-03, at 4 (Sept. 19, 2023)

14

(emphasis added; footnote omitted) (attached as Exhibit A).  The statement that Amex gave Broidy was as overbroad, vague, and uninformative as they come—anything in his many years of history banking with Amex could have been the real reason.  ECOA's notice protection means nothing if a statement that requires the applicant to guess is enough.

Furthermore, Amex violated Regulation B's prohibition against mere "[s]tatements that the adverse action was based on the creditor's internal standards or policies[.]"  12 C.F.R. § 202.9(b)(2); 12 C.F.R. § 1002.9(b)(2).  Amex's assertion in its June letter that "[t]he actions taken on your application were based on valid reasons and in accordance with our policies and procedures," Doc. 1-4, improperly relies on Amex's internal standards or policies, contrary to Regulation B.  Under Regulation B, as under the statute, it is legally "insufficient" for a creditor simply to refer to its standards or policies.  12 C.F.R. § 202.9(b)(2); 12 C.F.R. § 1002.9(b)(2).

Amex also violated ECOA and Regulation B because it did not disclose the true reason it denied Broidy credit.  A statement of reasons must be specific and *accurately* describe the creditor's *actual* reason.  The creditor's statement must "accurately describe the factors actually considered[.]" 12 C.F.R. Pt. 202, Supp. I, cmt. 9(b)(2)-2; 12 C.F.R. Pt. 1002, Supp. I, cmt. 9(b)(2)-2 (attached as Exhibit B).  *Accord Fischl*, 708 F.2d at 148 (creditor violated ECOA by providing "misleading" statement); *Barat v. Navy Fed. Credit Union*, 127 F.4th 833, 836 (11th Cir. 2025) (per curiam) ("The *Fischl* court determined that a misleading or excessively vague reason for a creditor's adverse action thwart[s] the objectives of the ECOA's notification requirement[.]").  In its motion to dismiss, Amex reveals for the first time that its reference to Broidy's "history with American Express" meant the October 2020 criminal charge for which Broidy received a pardon in January 2021.  *See* MTD at 2, 7, 16.  Announcing the pardon, the White House stated:

> President Trump granted a full pardon to Elliott Broidy.  Mr. Broidy is the former Deputy National Finance Chair of the Republican National Committee.  This

> pardon is supported by Representative Devin Nunes, Representative Ken Calvert, Representative Jack Bergman, Representative George Holding, Ambassador Ric Grenell, Bernie Marcus, Malcolm Hoenlein, Eric Branstad, Tom Hicks, Saul Fox, Lee Samson, Rabbi Steven Leder, Dr. Alveda King, Father Frank Pavone, Major General Clayton Hutmacher, Lieutenant General Bennet Sacolick, Mr. Bruce Brereton, Rabbi Steven Burg, Rabbi Pini Dunner, Rabbi Meyer May, and Rabbi Mordechai Suchard.  Mr. Broidy was convicted on one count of conspiracy to serve as an unregistered agent of a foreign principal.  Mr. Broidy is well known for his numerous philanthropic efforts, including on behalf of law enforcement, the military and veterans programs, and the Jewish community.[4]

Because of this pardon, Broidy has no felony on his record.  The Supreme Court long ago described the legal effect of a pardon:

> [A]s to the effect and operation of a pardon, … on this point all the authorities concur.  A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence.

*Ex parte Garland*, 71 U.S. 333, 380 (1866).  *Accord Fordham v. Ga. Dep't of Admin. Servs*., No. 23-11214, 2023 WL 5747709, at *2 (11th Cir. Sept. 6, 2023) (per curiam), *cert. denied,* 144 S. Ct. 808 (2024).

Amex's motion states that "Plaintiff knew that his 'history' includes his prior relationship with [Amex], which was cancelled following his felony conviction in 2020."  MTD at 16.  But Amex did not tell Broidy this on the phone or in its denial letter.  Amex did not breathe a word about his criminal case when it denied him credit in 2025.  And because the criminal case had nothing to do with Amex, it was highly misleading for Amex to say that its credit denial was based on Broidy's "history *with*" Amex.  The revelation in Amex's motion is proof that Amex violated ECOA by hiding the real reasons for its adverse action.  Amex cannot retroactively comply with

---

[4] White House, Statement from the Press Secretary Regarding Executive Grants of Clemency (Jan. 20, 2021), https://tinyurl.com/2jd73zak.

ECOA by sharing the truth only after getting sued.  In short, Amex has effectively admitted that it violated ECOA's requirement that it accurately provide the actual reason for denying credit.

Amex also argues that its statement of reasons was adequate to put Broidy on notice of why it denied him credit because Broidy supposedly "is well aware of his prior account closures, related documentation of which is incorporated by reference into his Complaint."  MTD at 17 (citing Amex's Exs. 4–7 (Docs. 11-4 to 11-7)).  This argument also fails.  Broidy's Complaint does not allege that he knew or believed that prior account closures had anything to do with Amex's denial of credit in 2025, and the Complaint does not incorporate by reference Amex's exhibits. Amex's exhibits therefore should not be considered on a motion to dismiss.  "[I]n considering a motion to dismiss, a court's review is confined to the four corners of the complaint."  *Idris v. Geovera Specialty Ins. Co.*, No. 22-60597-CIV-Dimitrouleas, 2022 WL 22864060, at *2 (S.D. Fla. Apr. 24, 2022) (citing *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009)).  "An exception exists for documents that were not attached to the complaint if they are central to a plaintiff's claim and their authenticity is undisputed."  *Id.*  And under ECOA, whether Broidy had reason to assume Amex's real reason for denying him credit is of no moment.  What matters is whether Amex gave him notice.  And since Broidy's Complaint does not refer to the non-public documents offered by Amex as its Exhibits 4–7, the Court cannot take judicial notice of them and cannot otherwise consider them.  But even if it did, the reason offered in those documents—*e.g.*, Doc. 11-4 ("we have closed the account because it was not being used for its intended purpose")— is just as vague, non-specific, and illegal under ECOA as the reason Amex offered to Broidy in 2025.

*Barat v. Navy Federal Credit Union* supports Broidy here.  The reason Navy Federal gave Barat—"[p]oor credit performance with Navy Federal," 127 F.4th at 835—is on Regulation B's

list of approved reasons, and Barat admitted he knew what Navy Federal meant. "Navy Federal used approved language verbatim in the statement of reasons that it provided to Barat, such that Barat should have been able to identify the cause of the denial." *Id*. at 836–37. "Included as an approved principal reason for adverse action in the 'Sample Notice of Action Taken and Statement of Reasons' is 'Poor credit performance with us.'" *Id*. at 836 (quoting 12 C.F.R. Pt. 202, App. C, Form C-1; 12 C.F.R. Pt. 1002, App. C, Form C-1 (attached as Exhibit C)). And by his own admission, "Barat knew precisely the problem that Navy Federal's statement of reasons was referencing when it stated that Barat had '[p]oor credit performance with Navy Federal.' Barat's complaint demonstrates that he knew Navy Federal was holding him responsible for some unpaid charges at the time of his application[.]" *Id*. at 837 (footnote omitted).

Here, unlike Navy Federal, Amex did not use "approved language." *Id*. at 836. The reason Amex gave Broidy is not on Regulation B's list of approved reasons. The list does not include "your history with us" or any similar reason.

Furthermore, unlike Mr. Barat, who "knew" that Navy Federal was referring to his "unpaid charges," *id*. at 837, Broidy did not know Amex was denying him credit because of his pardoned criminal case when it referred to his "history with Am[ex]." Compl. Ex. D. (Doc. 1-4). Broidy alleges that he "could not tell from Defendants' letter what supposed problem with his 'history' Defendants were referencing." Compl. ¶ 57 (Doc. 1). Given the procedural posture of this case, Broidy's allegation as to his mental state must be accepted as true. "An individual's state of mind cannot … be determined on a motion to dismiss." *Kostoski v. Steiner Transocean, Ltd*., 278 F.R.D. 695, 698 (S.D. Fla. 2012). One reason for this is Rule 9(b), which provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *See Firneno v. Radner Law Grp., PLLC*, No. 13-cv-10135, 2015 WL 4276340, at *5 (E.D.

Mich. Mar. 31, 2015) (citing Rule 9(b) in support of the proposition that "[s]tate of mind … is generally a question of fact not appropriate for resolution on a motion to dismiss.").

 *Chen v. Chase Bank USA* also supports Broidy.  In *Chen*, the court denied Chase's motion to dismiss Chen's ECOA notice claim.  Chase told Chen that his "[p]revious unsatisfactory relationship with this bank" was why it denied him a credit card.  *Chen*, 393 F. Supp. 3d at 851–52.  The court denied Chase's motion to dismiss, however, because "Chase's explanation alone gives Plaintiff no guidance as to what about his 'relationship' with Chase—his credit performance, his correspondence, or the length of it, among other reasons—was so 'unsatisfactory.'"  *Id*. at 856.  The court also cited Regulation B, explaining that a bank's reliance on "internal standards and scoring systems" are "appeals to a metric of which credit applicants would have no knowledge" and thus is "insufficient."  *Id*. (citing 12 C.F.R. § 1002.9(b)(2)).  Such reliance by a bank "provides no guidance as to what standard or policy the creditor considered, thereby leaving the applicant clueless as to why they were denied."  *Id*. (internal quotation marks omitted).  Because Chase's motion to dismiss was denied, it follows that Amex's motion should be denied as well.  Amex's vague reference to Broidy's "history" with the bank is insufficient.

## IV. If This Case Is Sent to Arbitration, the Motion to Dismiss Should Still be Denied.

 Amex's motion to dismiss should be denied.  If, however, this Court decides to refer this case to arbitration, the proper disposition is to stay the case, not dismiss it.  *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992) ("The district court properly found that the state law claims were subject to arbitration, but erred in dismissing the claims rather than staying them.  Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration." (citing 9 U.S.C. § 3)); *see also Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) ("For arbitrable issues, the language of Section 3 indicates that the stay is mandatory.").  As other Judges in this District have recognized, this

precedent, "along with the plain language of the statute," means that "it is appropriate to stay rather than dismiss a case when the case goes to arbitration." *Berardinelli v. EFN West Palm Motor Sales LLC*, No. 9:23-80908-CV-Middlebrooks, 2023 WL 11899135, at *2 n.1 (S.D. Fla. Aug. 1, 2023). If this Court concludes that arbitration is required, it should stay the case rather than taking the extraordinary step of dismissing it.

## CONCLUSION

For the foregoing reasons, Amex's motions to dismiss, to compel arbitration, and to stay the case should all be denied. If, however, arbitration is compelled, the case should be stayed, not dismissed.

Respectfully submitted,

*/s/ Edward H. Trent*
H. Christopher Bartolomucci*
Edward H. Trent (FBN 957186)
Joshua J. Prince*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com
jprince@schaerr-jaffe.com

*Admitted *pro hac vice*

*Counsel for Plaintiff Elliott Broidy*

Dated: September 10, 2025